Henry W. AINSLIE, Jr., Plaintiff,

v.

Sven E. SANDQUIST, Eric G. Sandquist, John W. McCarthy, Ronald A. Sandquist, Norma M. McCarthy, Olaf I. Ostlund and Ainslie Corporation, Defendants.

Civ. A. No. 65–322–J.

United States District Court
D. Massachusetts.

June 30, 1967.

Samuel Hoar, Jr., Joseph L. Cotter, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

Douglas Danner, Peter Hiam, Powers, Hall, Montgomery & Weston, Boston, Mass., for defendants.

## OPINION

JULIAN, District Judge.

This case was tried to the Court sitting without a jury. Based on all of the evidence presented, I make the following findings of fact and conclusions of law.

Over a period of two years prior to March 15, 1965, Sven Sandquist, a director of the Ainslie Corporation (hereinafter referred to as the "Corporation"), frequently took issue with Ainslie, the then president and treasurer, over management of the Corporation's affairs. At some time in early January 1965, Sven Sandquist decided to wage a proxy battle with the management for control of the Corporation.

A meeting was held in February 1965 between Sven Sandquist, Ainslie, Goodhue (attorney representing Ainslie during the period in question), Gulliver (attorney representing the opposition group, consisting of Eric and Sven Sandquist and John McCarthy), and Batchelder (an associate of Goodhue). At this meeting Goodhue announced that one segment of the management's proxy statement would contain a proposal that if Ainslie were not elected director and treasurer of the Corporation, the articles

of organization be amended to change the name of the Corporation to one not including the word "Ainslie."

Sven Sandquist stated that his proxy statement would contain the identical proposal.

Accordingly, the proxy statement of the management included this paragraph:

"As noted above, the Company has been informed, orally, by Sven E. Sandquist that he will vote for the election of a slate of Directors and officers which will not include the Messrs. Henry W. Ainslie, Jr. and Lawrence D. Ainslie, whose name with their consent has been used in the Company title since it was founded in 1954. Mr. Sandquist has also stated orally to the Company that if a new Board of Directors and officers of his selection are elected, it will have no interest in continuing to use the name Ainslie in the corporate title. Therefore, if the Messrs. Ainslie are not elected to each of the offices for which they have been nominated, the persons named in the enclosed proxy, unless otherwise directed, will propose and will vote in favor of changing the name of the Company to a name, chosen by the persons named in the enclosed proxy after consultation with Mr. Sandquist, which does not include the word 'Ainslie.' Under Massachusetts law the affirmative vote of two-thirds of the shares outstanding and entitled to vote is required to change the corporate name." (Exh. 9)

The "Notice of Special Meeting in Lieu of 1965 Annual Meeting of Stockholders" stated as one of the "purposes" the following:

"To consider and act upon a proposal to change the name of the Company if presented to the meeting." (Exh. 9)

The proxy statement of the opposition group included under "Purpose of This Solicitation" the words, " * * * and to change the name of the Corporation to one not including the name Ainslie." (Exh. 15) It also stated that "Data with respect to Selection of Auditor, Pro-

posal to Change the Name of the Corporation and Principal Stockholders are stated in the Proxy Statement issued by the Corporation. * * * If any other matters * * * shall come before the meeting, it is the intention of the Messrs. Sandquist to vote the proxy in accordance with their best judgment." (Exh. 15)

On March 11 or 12, 1965, Gulliver announced to Goodhue that it appeared to him from a counting of the proxies which he had received that the opposition group had won the proxy fight. Gulliver and Goodhue arranged to meet prior to the convening on March 15, 1965, of a special meeting of stockholders of the Corporation in lieu of the annual meeting in order to discuss ground rules and procedures for the conduct of the special meeting and to provide for the orderly transition from one management to another.

On March 12, Gulliver, on behalf of the opposition group, asked Goodhue to obtain the consent of Ainslie and his proxies to a postponement of that portion of the special meeting that would deal with changing the name of the Corporation. The reason given was that the opposition wanted additional time to consider a substitute name. Ainslie agreed to the postponement on condition that the adjourned meeting to consider this issue be held within a specified time. The date of March 22, 1965, was agreed upon for this adjourned meeting. It was also agreed that Mr. Gulliver was to address the special meeting to explain the reason for the postponement.

On March 15, at 2 p. m., the special meeting of stockholders was convened. Ainslie presided with Goodhue's assistance. Of the 273,000 shares of stock outstanding at that time (each share having one vote), 245,205 shares were represented at the meeting as follows:

95,165 represented by proxies to the Ainslie (Management) group
58,360 represented by proxies to the Sandquist (opposition) group
91,680 represented in person, of which Sven and Eric Sandquist owned

90,940 and McCarthy owned 200. (Stipulation 1, document A)

The Sandquist group (Eric, Sven and McCarthy, all of whom were present at the March 15 meeting) (Stipulation 1, document A) personally owned enough shares to adjourn the meeting to another day or to defeat a motion to change the name of the Corporation without resorting to proxy votes.

Ainslie, the then president and treasurer of the Corporation, delivered the treasurer's report in which he stated that the Corporation showed a loss for the previous fiscal year ending in October 1964, and an additional loss of approximately $22,000 for the first quarter of the then current fiscal year. (Exh. 2, pp. 11, 12) He further stated, "As of this moment, we have as of this morning approximately $21,000 in cash." (Exh. 2, p. 12)

Nominations were made for the office of Director, four persons being nominated by the management and four different individuals being nominated by the opposition group. The result of the balloting was that Sven Sandquist, Eric Sandquist, John McCarthy, and Robert Bowers were elected to the Board of Directors, and Eric Sandquist was elected Treasurer and Clerk. (Stipulation 1, Document A) (Exh. 2) After an explanation by both Goodhue and Gulliver of the reason for not voting on a motion to change the name of the Corporation until a new name could be decided on, a motion was made and adopted to adjourn the meeting until 2 p. m. on March 22, 1965.[1] (Exh. 2, pp. 15, 16, 18)

On March 16 or 17, Eric Sandquist obtained access to the books of the Corporation and discovered that on March 15, prior to the meeting, checks had been written and sent out by the Corporation in the total amount of approximately $17,000. This reduced the cash balance to $3,000 instead of the $21,000 referred

to by Ainslie in his treasurer's report. Compared to this $3,000 in available cash there was a payroll of $5,000 to $6,000 to be met the following day.[2] A change of name would have entailed the considerable expense of changing, among other things, all advertising brochures, stationery, stock certificates, catalogues, specification sheets, building and truck signs, and name plates for products.

On considering the financial condition of the Corporation and the expense involved in changing the name, Eric decided to take action to prevent the motion for a change of name from carrying. He solicited Ronald Sandquist, Norma McCarthy, Ostlund, and Tokar, all stockholders, to change their proxies to vote against the change. No proxy material was filed with the Securities and Exchange Commission (hereinafter referred to as the "Commission") regarding this resolicitation.

With particular regard to Ostlund, Eric Sandquist prepared a typewritten proxy form using wording supplied to him by Gulliver over the telephone. (Exh. 3) After Eric's solicitation of Ostlund by telephone, Ostlund signed the proxy directing that his shares be voted against the change of name. His proxy submitted prior to the March 15 meeting had favored the change.

On March 22, 1965, the adjourned meeting was convened at the offices of the Corporation. Sven and Eric Sandquist and Batchelder were present. (Stipulation 1, document B) Of the 273,000 outstanding shares of stock, 244,-465 shares were represented in person or by proxy as follows:

95,165 represented by proxies to the Ainslie group

58,360 represented by proxies to the Sandquist group

90,940 represented in person by Eric and Sven Sandquist. (Stipulation 1, document B)

---

[1]. A simple majority of the votes present was necessary to adjourn the meeting to another day.

[2]. A loan from the Harvard Trust had to be arranged to meet this payroll.

The motion to change the name of the Corporation was made and voted on. Under Massachusetts law a change of corporate name would require a two-thirds vote of all outstanding shares. (Stipulation 1, document B) Because only 180,485 votes were cast in favor of the change of name, the motion was defeated. (Stipulation 1, document B, p. 2)

Eric and Sven Sandquist knew that they had sufficient proxies to defeat the motion and in fact voted their proxies against the change. (Stipulation 1, document B) They did, however, vote their personally owned shares in favor of the motion, knowing it would be defeated.

On motion, the meeting was permanently adjourned.

The plaintiff brings this action seeking declaratory and injunctive relief [3] based primarily on two theories. Under the first theory the plaintiff claims that the defendants have violated the Securities and Exchange Act (hereinafter referred to as the "Act"). The plaintiff relies on the case of J. I. Case Co. v. Borak, 1964; 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, as authority for his right to bring a private cause of action for violation of the Act. In that case, a stockholder sought relief when a group successfully solicited proxies favoring a merger by circulating false and misleading solicitation material. The Court held that the stockholder could bring a private civil suit for relief based on the violation of the Act.

The particular section of the Act here concerned reads as follows:

"It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce * * * or otherwise, in contravention of such rules and regulations as the Commission may prescribe * * * to solicit * * * any proxy or consent or authorization in respect of any security * * * registered

pursuant to section 78(*l*) of this title." [4] 15 U.S.C. § 78n.

"Solicitation" is defined by rule of the Commission as "any request to execute or not to execute, or to revoke, a proxy." 17 CFR § 240.14a-1(f) (ii).

■■ Rule 14a-2, 17 CFR § 240.14a-2, states that Rules 14a-1 through 14a-11, 17 CFR §§ 240.14a-1 through 240.14a-11, apply to every solicitation of a proxy with respect to listed and registered securities except for a "solicitation made otherwise than on behalf of the management of the issuer where the total number of persons solicited is not more than ten." The solicitations by the Sandquist group after the March 15 meeting do not come within the exception because at that time they had become the "Management" of the Corporation.

Rule 14a-6(c), 17 CFR § 240.14a-6(c) required that:

"Four definitive copies of the proxy statement, form of proxy and all other soliciting material, in the form in which such material is furnished to security holders, shall be filed with, or mailed for filing to, the Commission not later than the date such material is first sent or given to any security holders."

This regulation was violated by the Sandquist group in the solicitation of Ostlund's proxy between March 15 and March 22 without filing copies of the proxy form with the Commission.

In addition, Rule 14a-3, 17 CFR § 240.14a-3, prohibits the solicitation carried on by the Sandquist group after March 15 "unless each person solicited is concurrently furnished or has previously been furnished with a written proxy statement containing the information specified in Schedule 14A." Item 3 of Schedule A requires that when a solicitation is made by the management of the issuer, that fact must be stated in the proxy statement. Since the Sandquist group issued no proxy statement in

---

3. The plaintiff has waived any claim for money damages.

4. The stock of the Corporation was, at all relevant times, registered on the National Stock Exchange.

connection with the resolicitation when it had, in fact, acquired the status of "management," this requirement was not complied with.

■ Finally, Rule 14a–9(a), 17 CFR § 240.14a–9(a), states that:

"No solicitation subject to §§ 240.14a–1 to 240.14a–10 shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication written or oral containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

This rule was violated in that the proxy form used in soliciting Norma McCarthy's vote against the change of name referred to. page two of the Sandquist proxy statement in which it was stated that "the purpose of this proxy solicitation is to enable the Messrs. Sandquist and Mr. McCarthy as your proxies * * * unless otherwise directed in the proxy * * * to change the name of the Corporation to one not including the name 'Ainslie.' " The implication in that statement that the Sandquist group favored the change of name was true when the proxy statement was printed prior to the March 15 meeting, but false at the time of the resolicitation of Norma McCarthy's proxy between March 15 and March 22.

Finally, Rule 14a–4(a), 17 CFR § 240.14a–4(a), requires that "the form of proxy (1) shall indicate in bold-face type whether or not the proxy is solicited on behalf of the management." This was not complied with by the Sandquist group in the resolicitation of proxies after the March 15 meeting.

I find, therefore, that the Sandquist group has violated 15 U.S.C. § 78n in its resolicitation. Because the Sandquists felt bound to vote their own shares in favor of the change of name at the March 22 meeting, and did so vote them, the motion would have carried if the proxies resolicited in violation of this statute had not been voted against the motion.[5]

The plaintiff further claims that Eric and Sven Sandquist and McCarthy entered into an agreement with the plaintiff in which they agreed to solicit proxies in favor of the change of name proposal, and a second agreement in which they agreed to select a new name for the Corporation to be adopted at the adjourned meeting. Because this issue affects other matters to be dealt with in this opinion, I shall consider it here.

Regarding the first alleged agreement, Goodhue testified as follows:

"In the course of [the meeting in February 1965 between Sven Sandquist, Ainslie, Batchelder, Gulliver and Goodhue] I announced that one segment of * * * the management's proxy statement—would contain a proposal to the effect that if Mr. Ainslie was not elected a Director and Treasurer of the Corporation, he would ask the stockholders to vote on a proposed amendment to the articles of organization of the corporation which would remove his name from the title of the corporation.

"At that meeting Mr. Sandquist stated that his proxy statement would contain the identical proposal."

I find that whatever may have been the understanding of the parties regarding their respective future conduct toward the accomplishment of a change of name, nothing amounting to a binding *agreement* was entered into by the par-

5. A vote of at least two-thirds of the 273,-000 shares outstanding would be required to change the corporate name. Therefore, the 90,940 shares owned by the Sandquists added to the 95,165 proxies sent to the Ainslie group would exceed the minimum 182,000 votes needed. There were additional proxies favoring the motion which came to the Sandquist group.

ties. No consideration whatever was given by Ainslie or the Ainslie group in return for any alleged promise on the part of the defendants or any of them to promote or permit the change of name.

Regarding the second alleged agreement, Goodhue testified that on March 12 Gulliver requested him to obtain the consent of his client to the postponement of that portion of the meeting dealing with the change of name. After conferring with Ainslie, Goodhue consented to the postponement on condition that the adjourned meeting be held on March 22, 1965.

The reason for requesting the postponement was to enable the new management to select a name for the Corporation that would not include the word "Ainslie." After the adjournment of the March 15 meeting the Sandquists reconsidered the advisability of changing the name and decided to attempt to defeat the proposal by soliciting shareholders whose proxies they held to change their proxies to oppose the change. The Sandquists themselves voted their own shares in favor of the change. They felt bound to do so at the time because, as members of the proxy solicitation committee, they had made statements in their proxy material indicating that they would vote their shares in favor of the change, and they believed that it would be unlawful to take any action that would make those statements false.

I find that this alleged agreement was not binding upon the defendants because here again there was no consideration flowing to them. On March 12, when Gulliver proposed the adjournment to Goodhue, the opposition group had sufficient proxies to adjourn the meeting, at least to another day, with or without the consent of the management group.

■ I find, therefore, that the defendants have breached no contractual obligation owed to the plaintiff or the management group.

■ Having found for the plaintiff on the basis of violations of the Act, I shall now consider the question of appropriate relief. The plaintiff has waived damages and merely seeks equitable relief. Specifically, he seeks to have the Court declare void all action taken at the meeting of March 22, including its adjournment, and order the defendants to reconvene the meeting to consider the change of name proposal and to vote all proxies given to them prior to March 15,[6] as well as their own shares, in favor of the proposal.

The Court, however, is unable to give the relief sought. Under Mass.G.L. c. 156, § 32, a proxy becomes invalid six months after its date of execution. Therefore, the Court could not order the voting of proxies executed prior to March 15, 1965. In addition, the shares of stock represented by those proxies may have been transferred to other owners since March 15, 1965, and the interests of the new owners must be considered in granting equitable relief. Furthermore, since Sven and Eric Sandquist were not bound contractually to vote their own shares in any particular way, there would be no basis for compelling them to vote for the change of name in violation of what they believe to be in the best interests of the Corporation.

At the very most, the Court could order the defendants to convene a special meeting of shareholders to consider the proposal to change the name. This, however, would be a fruitless gesture. Sven and Eric Sandquist (90,940 shares) remain opposed to the motion, as do John McCarthy (1,100 shares presently), and Ronald Sandquist (1,680 shares). Even disregarding the proxies that the management could in all probability amass against the change of name, the parties listed above own a total of shares well in excess of the 91,000 votes needed to defeat the motion.

In addition to the obvious fruitlessness of ordering a special meeting, two other

6. This would, of course, except those proxies which were against the proposal prior to the March 15 meeting.

factors should be considered. The first is the cost of preparing, printing, and mailing the necessary notice and proxy material. The only evidence in the case bearing on the financial condition of the Corporation indicated that at least as of March 15, 1965, any such burden would be a serious matter to the Corporation. The second consideration is the relative value of the name from a business standpoint to the Corporation and to the plaintiff. The plaintiff introduced no evidence, nor did he take the stand to testify himself, that he has any intention of using his name in the title of a business or corporation in the future. The lack of any injury in this regard is evidenced by his waiving of any damages. The value of the name to the Corporation, on the other hand, is inherent in the good will that has been built up since the founding of the "Ainslie Corporation" in 1954 by Ainslie and Sven Sandquist.

For these reasons the Court denies the equitable relief sought by the plaintiff.